### David B. WEIHAUPT, Plaintiff–Appellant,

v.

### AMERICAN MEDICAL ASSOCIATION, Defendant–Appellee.

Nos. 88–1745, 88–2043.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1988.

Decided May 2, 1989.

Rehearing and Rehearing En Banc Denied July 7, 1989.

Paul V. Esposito, Lewis, Overbeck & Furman, Chicago, Ill., for plaintiff-appellant.

John G. Levi, Sidley & Austin, Chicago, Ill., for defendant-appellee.

Before POSNER, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff David Weihaupt appeals the district court's grant of summary judgment and award of costs in favor of the American Medical Association ("AMA"), Weihaupt's former employer, in an age discrimination suit under 29 U.S.C. § 621, *et seq.* ("ADEA"). We affirm the grant of summary judgment in favor of the AMA. Because the district court failed to decide whether the AMA's requested costs are allowable and reasonable both in amount and necessity, we vacate the portion of the district court's judgment awarding costs and remand for such a determination.

## I.

The plaintiff began working for the AMA at age thirty-three in 1965. He was initially employed as a field representative in the AMA's Field Services office in Chicago, Illinois. After the AMA reorganized its field service operations in 1972, Weihaupt worked in the area of physician membership development.

In 1977, Weihaupt became Special Assistant to the Director of the Public Affairs Division. In this position he organized and implemented a program of conferences in which AMA leaders met with their counterparts in the business community to discuss strategies to combat escalating health care costs. The AMA admits that due in large part to Weihaupt's efforts in developing this program, the AMA was able to further its goal of establishing local medical-business coalitions designed to encourage business entities to provide adequate medical insurance coverage to their employees. Weihaupt's success in this area was responsible for his promotion to Director of the Office of Corporate Liaison ("OCL"), a position requiring Weihaupt to intensify his efforts to further develop local medical-business coalitions. According to the plaintiff, he worked six days per week and traveled 100,000 miles per year in fulfilling the responsibilities of his position.

In November 1980, Kenneth Monroe, age thirty-four, became AMA Vice-President for Health Services Policy—a position making him responsible for, among others, the activities of OCL. In May 1981, Monroe conducted his first formal evaluation of Weihaupt's performance as OCL director. Monroe gave Weihaupt an "overall satisfactory" rating, commenting that Weihaupt made "a fine contribution in a visible, difficult area...." He described as "excellent" Weihaupt's work in establishing local coalitions and found that he worked extremely well with coalition participants. Monroe stated that he was not as accomplished in conceptualizing and setting priorities among his own programs and the AMA's other objectives in this area, and further that Weihaupt's writing skills left something to be desired.

In June 1981, pursuant to a plan for broad changes throughout the AMA, Monroe restructured and reorganized the Health Services Policy group. The two-person Office of Corporate Liaison, then headed by Weihaupt, was renamed the Department of Medical–Business Relations ("DMBR") and placed under the supervision of William Cohan, age fifty-one, the Director of the Division of Health Services.

At approximately the same time this reorganization was being implemented, Weihaupt became aware of the fact that he was suffering from cancer, causing absence from work for surgery, treatment and recuperation for a period extending from October 1981 until mid-January 1982.

In late 1981, the AMA House of Delegates adopted a resolution, "Coalitions for Health Care," which encouraged the medical, business and labor communities to go "beyond the important stage of discourse and exchanging views" and jointly develop specific health care programs and projects. In response to this resolution, Monroe directed Cohan to develop and implement a divisional plan, as well as undertake a staffing analysis for his division—particularly for DMBR. On January 12, 1982, Cohan sent a memorandum to Monroe de-

scribing the skills required of the director and the staff of DMBR in order to implement the expanded goals for health care coalitions to comply with the guidelines the AMA House of Delegates set forth. Cohan identified the following skills as "essential": (1) the ability to conceptualize the most effective actions to be taken; (2) the ability to plan and organize the necessary work; (3) an analytical problem-solving ability; and (4) well-developed written and verbal communication skills.

After reviewing Cohan's list of qualifications, Monroe determined that Weihaupt was no longer qualified to direct the Department of Medical–Business Relations. Specifically, Monroe believed that Weihaupt lacked the ability to develop the measures necessary to implement the AMA's goals and analyze and conceptualize a plan, as well as organize a coherent strategy for the expanded coalition program. Furthermore, Monroe was of the opinion that Weihaupt's writing skills were inadequate to serve as the director of DMBR. Cohan, Weihaupt's immediate supervisor, agreed with Monroe's assessment of Weihaupt's skills and abilities, as well as his shortcomings.

Monroe thereafter reviewed his assessment of Weihaupt with Whalen Strohbar, Deputy Executive Vice–President of the AMA and Monroe's supervisor. Strohbar, age fifty, in addition to being a close personal friend of Weihaupt's, was very familiar with his work, had known him since 1965 when both of them were in the field service and also had had the opportunity to supervise him between 1972 and 1975. Strohbar concurred in Monroe's assessment of Weihaupt's abilities, as well as his conclusion that Weihaupt was not qualified to become the director of DMBR due to the requirements of the newly structured position, including the department's new policy-oriented responsibilities. Strohbar made it clear, though, that he believed Monroe should offer Weihaupt a staff position in the Department of Medical–Business Relations or an opportunity to transfer to another position within the AMA.

On February 4, 1982, Monroe informed Weihaupt, then fifty years old, of the new focus for DMBR and his conclusion that Weihaupt could no longer remain as director of the department because he lacked the skills essential for that position. Monroe added that Weihaupt would be retained in his liaison role with local medical societies, without any decrease in salary or benefits. Weihaupt queried Monroe, asking if this change in position was a demotion; Monroe responded that it was. Monroe and Weihaupt then discussed the current state of Weihaupt's health, his right to consider another position within the AMA, and the possibility of retirement under the AMA pension plan. According to Weihaupt, at the conclusion of this discussion Monroe asked him what he thought about the decision to replace him as the DMBR director. Weihaupt responded that "it was evident to [him] that the AMA wanted younger people ... [a]nd considering that [he] had been seriously ill and was over fifty years old and due for an increase, [he] wasn't surprised." Monroe did not respond to this statement. At the close of the meeting, Monroe suggested that Weihaupt speak with other AMA officials regarding his benefits under the AMA pension plan. The district court summarized the discussions between the plaintiff and these officials in its memorandum and order:

"Plaintiff subsequently met with the AMA's vice-president of human resources, Chris Theodore, who produced a list of possible retirement plans for plaintiff to pursue. Plaintiff claims that Theodore suggested that it would be best if plaintiff terminated his employment, although the context indicates that the suggestion related to plaintiff's health due to cancer. Apparently Strohbar had the same recommendation for plaintiff. Plaintiff again met with Monroe to determine whether he was being offered a new job or whether he was being asked to leave. Monroe reportedly stated that both were up for consideration. Plaintiff does not state that he then asked for a final word on whether he was being fired. Instead, plaintiff continued to consider his options and later met with AMA

general counsel, Bernie Hirsch. At his deposition Hirsch testified that he informed plaintiff that there were particularly beneficial provisions for 'involuntary' retirement and termination for employees when there is a significant change of duties. Plaintiff claims that Hirsch informed him that he had no choice but to leave the AMA, but plaintiff also testified that Hirsch thought he was going to die soon, and again the context indicates that Hirsch meant that plaintiff had no choice because of his health. In fact, in August 1985 plaintiff filed an affidavit with the Social Security Administration claiming that he was totally disabled as of March 1982. There was never any reference by any AMA official about plaintiff's age.

Prior to his departure from the AMA, plaintiff produced a list of severance requests. Drawing from those requests the AMA agreed to continue plaintiff's health insurance until November 1982, to provide a stipend to cover two additional years of insurance coverage, to pay plaintiff six months' severance pay, to pay a lump sum retirement amount approaching $250,000, and to provide letters of recommendation and assistance in establishing a new business venture. Upon leaving the AMA plaintiff submitted a written resignation which concluded: 'I have decided to exercise my options within the AMA's Employee Benefit Plan and to retire from service.' Although plaintiff testified that Monroe told him it would be better for him to resign rather than be discharged, and threatened to withhold his severance requests unless he did so, plaintiff's severance requests specifically recognized that he had the option to remain with the AMA."

*Weihaupt v. American Medical Association,* No. 83 C 7917, slip op. at 5–6, 1988 WL 20050 (N.D.Ill. February 29, 1988).

In August 1982, the AMA hired Susan Kuntz, age thirty-six, for the position of Director of the Department of Health Care Coalitions, which had absorbed the Department of Medical–Business Relations. Kuntz's responsibilities in her previous em-

ployment included the researching of health care issues, editing a monthly newsletter, analyzing proposed legislation, drafting testimony, and preparing written responses to proposed federal rules.

On November 4, 1983, Weihaupt filed this age discrimination action in the United States District Court for the Northern District of Illinois, alleging that the AMA had violated the ADEA in demoting and/or discharging him from his position as DMBR director because of his age. After extensive discovery the AMA moved for summary judgment arguing that no reasonable jury could find that the AMA discharged or demoted Weihaupt because of his age based on the evidence presented. The district court granted the AMA's motion on February 29, 1988, ruling that Weihaupt had failed to offer evidence sufficient to establish that he was directly or constructively discharged or that his alleged demotion was based on his age. In addition, the AMA submitted a bill of costs to recover its expenses in responding to Weihaupt's claim. Weihaupt objected to the AMA's bill of costs due to its lack of specificity. The district court agreed with the AMA's position regarding costs and awarded them $3,055.30 for deposition costs and $3,086.60 for photocopying expenses.

On appeal, Weihaupt argues that: (1) the district court erred in granting summary judgment in favor of the AMA because the evidence created genuine issues of material fact regarding whether the AMA had discharged him and whether the AMA's proffered reasons for demoting and/or discharging him were pretexts for age discrimination; and (2) the district court erred in awarding costs to the AMA because the AMA failed to specifically itemize the deposition and reproduction charges and, thus, the court was in no position to determine the reasonableness of the charges.

## II.

This case presents us with the application of the standards governing summary judgment motions in the context of a disparate treatment claim under the ADEA.

We were recently confronted with a similar question in *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir.1988). In *Mechnig*, we set forth the standards which dictate our review of a grant of summary judgment:

"'A motion for summary judgment should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P 56(c). In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Illinois v. Bowen*, 808 F.2d 571, 574 (7th Cir.1986). However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). "The court should neither 'look the other way' to ignore genuine issues of material fact, nor 'strain to find' material fact issues where there are none...." *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir.1987)) (quoting *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir.1972)).'"

864 F.2d at 1363–64 (quoting *Beard v. Whitley County REMC*, 840 F.2d 405, 409–10 (7th Cir.1988)).

■ "In determining whether a genuine issue of material fact is present we must consider both the substantive law of employment discrimination and burdens of proof applicable under this law." *Williams v. Williams Electronics*, 856 F.2d 920, 922 (7th Cir.1988). A plaintiff alleging a violation under the ADEA has the ultimate burden of establishing "that his employer took some adverse employment action ... against him on the basis of his age" and that this action would not have been taken but for his age. *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 545 (7th Cir.1988).

"A plaintiff may prove age discrimination by either of two methods. She may try to meet her burden head on by presenting direct or circumstantial evidence that age was the determining factor in her discharge.... Or, as is more common, she may utilize the indirect, burden-shifting method of proof for Title VII cases originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later adapted to age discrimination claims under the ADEA."

*Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988). Weihaupt offers evidence under both methods in his attempt to prove that the AMA discriminated against him based on his age.

■ Under the first method, Weihaupt alleges that direct evidence of age discrimination existed in three forms: (1) Monroe's failure to respond to Weihaupt's statement that "it was evident to [him] that the AMA wanted younger people" and that he wasn't surprised that he was being demoted from the DMBR directorship because he "was over 50 years old and due for an increase [in salary]...." was an adoptive admission of Weihaupt's statement, because Monroe would have denied Weihaupt's charges of age discrimination had they been untrue; (2) the AMA considered its pension plan benefiting employees over 50 and containing provisions on involuntary retirement in

its decision to discharge him; and (3) the AMA had previously used the pension plan to discharge or force the retirement of older employees.

As an initial matter, Weihaupt has waived his adoptive admission argument because he failed to present this issue in a timely fashion—after the trial court had granted summary judgment in favor of the AMA. Weihaupt attempts to overcome this problem by arguing that he raised the issue, albeit indirectly, in his motion to alter or amend the judgment filed pursuant to Fed.R.Civ.P. 59(e). This court stated in *Federal Deposit Insurance Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986), that such motions "cannot be used to raise arguments which could, and should, have been made before the judgment issued." In spite of the fact that Weihaupt was well aware of Monroe's failure to respond to his allegations of age discrimination prior to the court's entry of summary judgment in favor of the AMA, the record establishes that Monroe was not questioned about his silence at his deposition, nor was Monroe's so-called adoptive admission presented to the court in Weihaupt's memorandum in opposition to the AMA's summary judgment motion. We therefore hold that Weihaupt's attempt to raise the issue for the first time in his Rule 59(e) motion was untimely and refuse to consider it on appeal.

■ Weihaupt also offers as direct evidence of age discrimination the conclusory allegation that the AMA "considered" its early retirement plan in its decision to discharge him. The obvious flaw in this argument is that Weihaupt resigned; he was not discharged. The deposition testimony of the individuals responsible for restructuring the Department of Medical–Business Relations and demoting Weihaupt—Monroe, Cohan and Strohbar—reveals that these individuals were willing to retain Weihaupt in DMBR in a staff position at the same salary that he was receiving as the director, in spite of their belief that he was unqualified to direct the activities of the newly structured department. Monroe communicated the willingness to retain We-

ihaupt in a different capacity in their meeting on February 4, 1982. Only after informing Weihaupt that he was being demoted and noting Weihaupt's consternation did Monroe instruct Weihaupt to speak with Theodore and Hirsch about his rights under the AMA's pension plan. Under the plan, an employee who is over 50 and has worked for the AMA at least 15 years may *elect* "to terminate his employment because of a change in his position to one of substantially reduced duties and responsibilities" and take advantage of the increased retirement benefits available to employees who have been terminated. Thus, it becomes clear that Monroe's purpose in sending Weihaupt to discuss the plan with Theodore and Hirsch was to ensure that Weihaupt was properly advised of his options under the plan before he made a decision to accept or reject the staff position in DMBR.

The only evidence Weihaupt offers in support of his claim that he was actually discharged are statements made by Theodore and Hirsch indicating that Weihaupt had no choice but to take advantage of the early retirement plan. The record reveals that both Theodore and Hirsch made these statements in reference to Weihaupt's present and impending serious health problems. Indeed, Weihaupt testified that he perceived Harrison to think that he "was going to die at any moment." Even if we agreed with Weihaupt's assertion that the statements of Theodore and Hirsch informing him that he had no choice but to resign from the AMA are evidence of actual discharge, which we do not, a discharge based on his poor health is not actionable under the ADEA. " 'Congress made plain that the age statute was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or diminished vigor and competence.' " *Holley v. Sanyo Manufacturing, Inc.*, 771 F.2d 1161, 1167 (8th Cir. 1985) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1016 (1st Cir.1979)). Thus, our review of the record reveals that Weihaupt's evidence fails to support his claim that he was actually discharged through the use of the AMA's early retirement

plan. Weihaupt has offered only the plan itself, which we have stated "is a benefit to the recipient, not a sign of discrimination." *Henn v. National Geographic Society*, 819 F.2d 824, 828 (7th Cir.1987).

Weihaupt's evidence also falls far short of creating a factual dispute on his contention that he was constructively discharged. The offer of early retirement under the AMA's pension plan, standing alone, does not constitute constructive discharge. *See Henn*, 819 F.2d at 829. "An employer constructively discharges an employee only if it '*makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986) (emphasis in *Bartman;* citations omitted).

Weihaupt offers essentially the same evidence to support his theory of constructive discharge that he presented in his actual discharge argument. The evidence, even when read in the light most favorable to Weihaupt, fails to create a jury question that his working conditions were so intolerable that he was forced to resign. Although the record reveals that both Strohbar and Monroe were aware that Weihaupt's demotion might be embarrassing for him, there is no evidence whatsoever that Weihaupt was demoted with the intention of forcing his resignation.[1] In fact, even though Weihaupt lost the title of DMBR director, had he accepted the staff position in the department, he would have performed substantially the same duties as he had in the past without suffering either a loss in salary or benefits. We affirm the district court's finding that there was insufficient evidence to create a jury question on whether Weihaupt was discharged, actually or constructively, from the AMA.

■ Similarly, Weihaupt's claim that the AMA had previously used its pension plan to discharge or force the retirement of older employees finds no support in the record. The only evidence Weihaupt offers

in support of this claim is a 1974 memorandum identifying AMA personnel eligible for retirement. Weihaupt speculates that "[d]efendant's designs may have been illegal because the list and 'its possible intent' were to remain confidential...." Weihaupt offers no evidence that any of the individuals on the list were forced into retirement based on their eligibility under the plan. Thus, Weihaupt again offers merely the early retirement plan as evidence that the AMA discriminated on the basis of age in the past. This court's decision in *Henn, supra,* makes clear that an early retirement program, standing alone, does not rise to the level of establishing an employer's motive for age discrimination. 819 F.2d at 828–29.

In sum, we affirm the district court's finding that Weihaupt failed to offer direct evidence sufficient to support his age discrimination claim against the AMA. Thus, we turn to the question of whether Weihaupt can establish his claim through an indirect method of proof.

As we recently stated in *Mechnig, supra:* "In the indirect method of proof, as an initial matter, 'the [employee] has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination.' *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 [101 S.Ct. 1089, 1093–94, 67 L.Ed. 2d 207] (1981)....

When a *prima facie* case has been demonstrated, 'the burden shifts to the [employer] "to articulate some legitimate nondiscriminatory reason"' [ ] for its action. 'This burden is only one of production, as the "ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the [employee] remains at all times with the [employee]."' *Williams*, 856 F.2d at 923 (quoting *Burdine*, 450 U.S. at 253 [101 S.Ct. at 1093] ).

If the employer satisfies its production burden, the employee has 'an opportunity

---

1. Weihaupt argues that Monroe's threats to withhold his severance requests if he didn't turn in a letter of resignation is evidence that the AMA intended to force his resignation. However, this conversation did not take place until after Weihaupt had announced his intention to exercise his option of early retirement.

to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination.' *Burdine*, 450 U.S. at 253 [101 S.Ct. at 1093] (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 [93 S.Ct. 1817, 1825, 36 L.Ed.2d 668] (1973))." 864 F.2d at 1364 (footnote omitted).

 In order to establish a *prima facie* case under the ADEA, Weihaupt must establish that: (1) he was in the protected class (age 40 or older); (2) his job performance met his employer's legitimate expectations; (3) he was discharged or demoted; and (4) the employer sought a replacement for him.[2] *Oxman*, 846 F.2d at 452–53; *Vaught v. R.R. Donnelley & Sons Co.*, 745 F.2d 407, 411 (7th Cir.1984). It is undisputed that Weihaupt has satisfied the first and fourth elements: Weihaupt's age at the time he was demoted (fifty) clearly places him within the protected class, and the AMA sought and ultimately found a replacement for him.[3] Although we have determined that Weihaupt was neither actually nor constructively discharged by the AMA, Weihaupt has satisfied the third element of his *prima facie* case since it is uncontested that Weihaupt was demoted from his position as director of the Department of Medical–Business Relations.

With respect to the second element, the AMA admits that Weihaupt was well qualified to be the director of the Department of Medical–Business Relations before the reorganization when the department's activities focused on implementing the medical-business coalition program. The AMA correctly states that this fact is irrelevant in determining whether Weihaupt was qualified to remain in the director's position in light of DMBR's restructuring and reorganization to allow for a new policy-oriented focus. *See Grohs v. Gold Bond Building Products*, 859 F.2d 1283, 1287 (7th Cir. 1988) ("[W]hether one is qualified may change from time to time. The fact that an individual may have been qualified in the past does not mean that he is qualified at a later time"). Indeed, as we stated in *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1425 (7th Cir.1986):

> " 'Qualification obviously depends on the nature of [the] business at any given time. One year an out-going business-getter type might be best qualified, while in the next, after the business was got, it might be a cloistered scientist or mathematician. To ignore the shifting nature of qualification from time to time would make the qualification requirement meaningless . . . .' "

(quoting *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1219 (7th Cir.1980)). The AMA argues that Weihaupt was no longer qualified to be the director of DMBR because he lacked strong substantive knowledge of health care policy issues, analytical and organizational abilities and the level of writing skills required of the new position, as agreed upon by his immediate supervisors—Monroe, Cohan and Strohbar. Weihaupt testified in his deposition that he possessed all of these abilities as evidenced by his work in the corporate visitation program: he organized and initiated the AMA's local medical-business coalition program; through his involvement in this program he gained experience in various health care issues, such as health maintenance organizations and the escalating costs of medical care; and, finally, he pre-

---

2. As we noted in *Mechnig, supra*, "[t]here is some inconsistency in our cases concerning the element 'that the employer sought a replacement for' the employee." 864 F.2d at 1364 n. 5. *Compare, e.g., Oxman, supra*, 846 F.2d at 453 (stating the fourth element as the employer sought a replacement for the employee) *with Grohs v. Gold Bond Bldg. Prods., infra*, 859 F.2d at 1286 (stating the fourth element as the employer replaced the employee with a younger person). As in *Mechnig*, we need not resolve this apparent conflict, because of our holding, *infra*, that Weihaupt failed to present a genuine issue of material fact on the question of whether the AMA's reasons for demoting Weihaupt were pretexts for age discrimination. Thus, whether Weihaupt demonstrated a prima facie case is not determinative of our resolution of this case.

3. Because Susan Kuntz, age thirty-six, was younger than Weihaupt when she replaced him, Weihaupt has satisfied the fourth element of a *prima facie* case of age discrimination, regardless of which standard for that element, *see supra* note 2, is applied.

pared various reports, letters and proposals throughout the tenure of his career that were submitted and approved by the AMA house of delegates. This testimony meets Weihaupt's burden of establishing that he met the AMA's legitimate expectations at the time of his demotion. *See Williams,* 856 F.2d at 923 n. 6 ("A determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a *prima facie* case, may be based solely upon the employee's testimony concerning the quality of his work"). Weihaupt has thus established a *prima facie* case of age discrimination.

Because Weihaupt satisfied his initial requirement of establishing a *prima facie* case, "a rebuttable presumption of discrimination arises and the burden shifts to the [AMA] to articulate a legitimate non-discriminatory reason for the [demotion]." *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 463 (7th Cir.1986). As noted above, the AMA stated that it demoted Weihaupt from the Department of Medical–Business Relations directorship because he lacked the necessary qualifications to direct DMBR's newly structured policy-oriented activities: broad knowledge of health care issues, analytical abilities and good writing skills. This explanation satisfies the AMA's burden of production and rebuts the presumption of discrimination raised by Weihaupt's *prima facie* case. *See id.* at 464.

Thus, the appropriateness of the trial court's grant of summary judgment in favor of the AMA depends on whether Weihaupt's evidence created a genuine issue of material fact on the question of whether the AMA's articulated reasons for demoting him were mere pretexts for discrimination. In *Mechnig, supra,* we observed:

"The employee may make this showing of pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' *Burdine,* 450 U.S. at 256 [101 S.Ct. at 1095]. We have stated that the employee may demonstrate that the em-

ployer's reasons are unworthy of credence through evidence 'showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge *or* (3) that they were insufficient to motivate discharge.' *Kier v. Commercial Union Ins. Companies,* 808 F.2d 1254, 1259 (7th Cir.1987) (emphasis in original)."

864 F.2d at 1364–65. Weihaupt attempts to establish a pretext through the introduction of evidence that the AMA's explanation for demoting him was unworthy of credence, as well as through evidence that the AMA's actions were more likely than not based on his age.

With respect to the credence to be given to the AMA's rationale for demoting him, we note that Weihaupt "must do more than challenge the judgment of his superiors through his own self-interested assertions.... '[The employee's] perception of himself ... is not relevant. It is the perception of the decision maker which is relevant.' " *Dale,* 797 F.2d at 464–65 (quoting *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980)).

Weihaupt's presentation falls far short of convincing us that the AMA's reasons for demoting him are unworthy of credence. In support of his contention that the determination that he lacked the qualifications essential to direct DMBR had no basis in fact, he offers evidence consisting largely of his own self-interested assertions on his ability to direct the Department of Medical–Business Relations and speculation on the motives of Monroe, Cohan and Strohbar. Such evidence is insufficient to show pretext. *See Dale,* 797 F.2d at 464–65.

Weihaupt also presents evidence of his past salary increases, job evaluations and promotions in support of his claim that his supervisors' assessment of his qualifications had no basis in fact. The AMA readily admits that Weihaupt's past performance in implementing the coalition program was excellent, but argues that this evidence fails to establish that he was qualified to direct the newly structured DMBR

in light of the department's new policy-oriented focus.

Monroe, Cohan and Strohbar determined that Weihaupt lacked the necessary knowledge of health care policy issues, analytical and organizational abilities and good writing skills. The record reflects that this determination was based on Weihaupt's failure to define a long-range strategy for the medical-business coalitions, Weihaupt's failure to make travel arrangements in coordination with his other responsibilities in DMBR and his failure to prepare a book for submission to an AMA leadership conference. Weihaupt attempts to explain away these criticisms with various self-serving assertions, but his justification for all of the above events is that he lacked sufficient time to complete these tasks. Although a pretext may exist if an employer imposes unreasonable requirements on an employee, *see Kephart, supra,* 630 F.2d at 1223, Weihaupt's assertion that he lacked sufficient time is made in each instance in the context of his rigorous travel schedule. Thus, Weihaupt's superiors' determination that he lacked the organizational skills, among other shortcomings, including his inability to prioritize his coalition activities with his other job requirements in the newly structured and reorganized DMBR, in our opinion, is well founded.

With regard to the determination that he lacked knowledge on policy issues and good writing skills, Weihaupt's evidence, at best, raises a mere inference that the AMA officials were mistaken in their assessment of his skills in these areas. As we have stated in the past, we again emphasize:

"[W]e do 'not sit as a super-personnel department that reexamines an entity's business decisions.' *Dale,* 797 F.2d at 464. 'No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere.' *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 560 (7th Cir.1987). Rather, our inquiry is limited to 'whether the employer gave an honest explanation of its behavior.' *Id.*"

*Mechnig,* 864 F.2d at 1365. *See also Dorsch,* 782 F.2d at 1426. Thus, even if the AMA's conclusions on his abilities might be without a sound basis, Weihaupt fails to establish an ADEA violation if the evaluation was made in good faith. "An evaluation is made in good faith if it was genuinely and honestly made in an attempt to select the employees to be retained on the basis of performance related considerations." *Id.*

Weihaupt's evidence fails to raise any inference whatsoever of bad faith on the part of the AMA. Weihaupt argues that because the qualifications that the AMA determined he lacked were "subjective," the AMA could have easily masked its intent to discriminate against him based on his age. Although this may be true in theory, Weihaupt has submitted nothing to challenge the validity of his supervisors' belief that he was unqualified to remain the director of DMBR. The mere fact that their beliefs were based on subjective factors fails to establish that their assessment of Weihaupt's skills were made in bad faith. As we stated in *Dorsch, supra:* "A subjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one." 782 F.2d at 1427. Moreover, the evidence of Weihaupt's inability to coordinate his travel schedule with his other responsibilities in DMBR persuades us that his supervisors not only acted in good faith in their decision to demote Weihaupt, but also that the decision had a basis in fact.

Weihaupt's proffered evidence also fails to establish that his demotion was more likely than not based on his age. As an initial matter, we think it highly unlikely that the recommendations of Cohan and Strohbar, both of whom were approximately the same age as Weihaupt, were founded upon the belief that he was too old to perform the duties required of the director of the Department of Medical–Business Relations. Weihaupt's evidence fails to raise an inference that either of these officials, or Monroe for that matter, took his age into account in their decision to demote him.

The only evidence that Weihaupt offers is his allegation that Susan Kuntz, age thirty-six, was unqualified to replace him as DMBR director and that the AMA's coalition activity decreased substantially under her direction. Thus, he somehow concludes, she was hired to replace him solely because she was younger. Weihaupt seems to ignore the fact that Kuntz, in her prior position, had been responsible for analyzing health care issues, editing a monthly newsletter, analyzing proposed legislation, drafting testimony for public hearings, and preparing written responses to proposed health care regulations. Based on this experience, it would seem that Kuntz possessed the skills that Monroe and Cohan regarded as "essential" for the director of DMBR—particularly with regard to her analytical and writing skills, both of which Weihaupt's supervisors determined he lacked. Furthermore, Weihaupt's evidence of decreased coalition activity after Kuntz assumed the director's position, if anything, establishes that the AMA's focus had indeed shifted from the implementation of medical-business coalitions to the concentration on policy analysis and technical assistance to existing coalitions that was mandated by the AMA House of Delegates. Because the record is clear that Kuntz was qualified to assume the directorship position, Weihaupt is left only with the fact that he was replaced by someone younger. However, the difference in age between Weihaupt and Kuntz, in and of itself, fails to raise an inference of age discrimination:

> "It is not a violation of the Act to replace an employee in the protected class with a younger person, as long as the protected employee is not replaced because of his age. Because younger people succeed to the jobs of older people for perfectly legitimate reasons, the mere fact that an older employee is replaced by a younger one does not permit an inference that the replacement was motivated by age discrimination."

*La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1413 (7th Cir.1984).

Simply stated, Weihaupt's evidence is insufficient for a reasonable factfinder to conclude that age was a motivating factor in the AMA's decision to demote him. We are convinced from our review of the record that Weihaupt was demoted because of the AMA's well documented, good faith determination that he lacked the necessary skills to direct the activities of the Department of Medical–Business Relations in light of the department's new emphasis on health care policy issues. Thus, Weihaupt has failed to raise a genuine issue of material fact on the question of whether the AMA discriminated against him because of his age. We affirm the district court's entry of summary judgment in favor of the AMA.

### III.

Weihaupt's final argument on appeal is that the district court erred in awarding the AMA $3,055.30 in deposition costs and $3,086.60 in photocopying expenses. It is well settled that the district court has broad discretion when determining whether expenses claimed by the prevailing party are taxable as costs. *Brandt v. Schal Associates, Inc.*, 854 F.2d 948, 955 (7th Cir.1988); *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 852 F.2d 936 (7th Cir.1988). This discretion, however, is not unfettered. *SCA Services, Inc. v. Lucky Stores*, 599 F.2d 178, 180 (7th Cir.1979). In order for the district court to award costs to the prevailing party, the court must determine that the expenses are allowable cost items and that the costs are reasonable, both in amount and necessity to the litigation. *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1282 (7th Cir.1983); *State of Illinois v. Sangamo Construction Co.*, 657 F.2d 855, 864 (7th Cir.1981).

Weihaupt argues that the district court failed to make these determinations in awarding deposition and photocopying costs to the AMA. We agree. In its order awarding costs to the AMA, the district court merely restated Weihaupt's objection to the AMA's bill of costs and concluded that the AMA was entitled to recover its costs in the requested amounts from Weihaupt. The court failed to make any findings on, and thus we are unable to review,

whether the expenses the AMA labeled "costs incident to depositions" and "fees for exemplification and photocopying" were allowable, much less determine whether they were reasonable in amount and necessity to the litigation. Because the AMA's request for $3,086.60 in photocopying costs, assuming a rate of $0.25 per copy, would result in Weihaupt being taxed for 12,346 copies, we agree with the plaintiff's conclusion that the defendant's bill of costs merits closer scrutiny than the district court originally gave it. We vacate the district court's award of costs to the AMA and remand for a hearing to determine whether the costs are allowable and reasonable, both in amount and necessity to the disposition of this case. The trial court, having presided over the no doubt paper-intensive summary judgment battle, is in a better position than we are to make the necessary determinations regarding the AMA's bill of costs.

### IV.

We hold that the district court properly granted the AMA's motion for summary judgment on Weihaupt's age discrimination claim. Weihaupt failed to proffer evidence sufficient to create genuine issues of material fact on the question of whether his age was a motivating factor in the AMA's decision to demote him from the position of DMBR director. On the issue of costs, we vacate the district court's award of costs to the AMA and remand to the trial court for a determination that the costs requested by the AMA are both allowable and reasonable.

AFFIRMED IN PART;

VACATED IN PART;

CAUSE REMANDED.